AO 91 (Rev. 11/11) Criminal Complaint

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

United States Courts
Southern District of Texas
FILED
*August 22, 2025*
Nathan Ochsner, Clerk of Court

| | |
|---|---|
| United States of America<br>v.<br>Sandesh Suryavanshi<br>AKA "Tessler Brown"<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  **4:25-mj-0505**<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __January 2023__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b<br>18 U.S.C. § 2 | Paying Kickbacks in Connection with a Federal Health Care Program |

This criminal complaint is based on these facts:
See the attached affidavit in support of criminal complaint.

TRUE COPY I CERTIFY
ATTEST: August 22, 2025
NATHAN OCHSNER, Clerk of Court
By: *s/ Peyton Smith*
Deputy Clerk

☒ Continued on the attached sheet.

*Complainant's signature*
Cooper Ferreira, FBI Special Agent
*Printed name and title*

Sworn to and signed by telephone

Date: __August 22, 2025__

City and state: __Houston, TX__

*Judge's signature*
Hon. Peter Bray, U.S. Magistrate Judge
*Printed name and title*

Sealed
Public and unofficial staff access to this instrument are prohibited by court order

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Cooper Ferreira, being duly sworn, do depose and state as follows:

### I. Introduction

1. Since at least 2021, Sandesh Suryavanshi ("SURYAVANSHI") has been involved with diagnostic laboratories in and around Houston, Texas, and other parts of the country. These laboratories billed Medicare for genetic testing that was often medically unnecessary and induced by illegal kickbacks. SURYAVANSHI assisted Chad Harper and Stephen MacLauchlan—defendants charged in June 2025 in the Southern District of Texas—with illegal kickback payments arising out of operations of laboratories owned by Harper and MacLauchlan.

2. Harper and MacLauchlan's laboratories billed Medicare for medically unnecessary genetic testing procured through illegal kickbacks to marketers. One such marketer was John Finlay.[1] Finlay was the practice manager of a clinic in Houston and also a marketer for Harper and MacLauchlan's laboratories. Based on the investigation, and as set forth here, I have probable cause to believe that in January 2023, SURYAVANSHI aided and abetted the payment of an approximately $30,000 kickback from Harper and MacLauchlan's laboratories to Finlay.

### II. Identity and Experience of Affiant

3. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Houston division and have been so employed for approximately 2 years. I am assigned to investigate health care fraud matters and have been assigned for approximately 18 months.

4. I have participated in investigations into violations of federal laws and am currently assigned to investigate crimes related to federal health care offenses, including Health Care Fraud, violations of the Anti-Kickback Statute, and Money Laundering. I have participated in joint

---

[1] Finlay was indicted with Harper and MacLauchlan. The case is *US v. Harper et al.*, Case No. 4:25-cr-337.

1

investigations of health care fraud with the U.S. Department of Justice's Texas Health Care Fraud Strike Force, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and the Medicaid Fraud Control Unit ("MFCU").

### III. Purpose of the Affidavit

5.  This affidavit is made in support of an arrest warrant and complaint charging Sandesh Suryavanshi, a.k.a. Tessler Brown, ("SURYAVANSHI") with Payment of Kickbacks in Connection with a Federal Health Care Program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2, in and around January 2023.

6.  This case is being investigated by the FBI, HHS-OIG, and MFCU.

7.  The information set forth in this affidavit is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit.

8.  Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning this investigation but rather sets forth only those facts that I believe are necessary to establish probable cause. All figures, dates, and calculations are approximate.

### IV. The Alleged Offense

9.  42 U.S.C. § 1320a-7b(b)(2)(B) makes it illegal to knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program.

2

## V.  The Medicare Program

10.  Medicare is a federally funded health insurance program that provides health care benefits to individuals who are 65 years of age or older or disabled. It is a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f). Medicare is administered by HHS through its agency, the Centers for Medicare and Medicaid Services ("CMS").

11.  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of items and services. Relevant here, Medicare Part B covers laboratory testing, such as genetic testing, when certain criteria are met.

12.  When receiving and adjudicating claims, Medicare acts through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which are statutory agents of CMS for Medicare Part B. MACs are private entities that review claims and make payments to providers for services rendered to beneficiaries. MACs are responsible for processing Medicare claims arising within their assigned geographical area, including determining whether a claim is for a covered service. Novitas Solutions, Inc. ("Novitas") is the MAC that handles Medicare Part B for Texas and other states. To receive Medicare reimbursements, providers, including clinical laboratories, physicians, and others, who provide services to beneficiaries, need to have applied to the assigned MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, must be signed by an authorized representative of the provider. Form 855B contains a certification that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . . The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is

3

conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

13. In executing CMS Form 855B, providers further certify that they "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

14. When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

15. Medicare does not pay for claims that were procured through kickbacks.

## VI. Diagnostic Laboratory Testing Services

16. The Social Security Act, 42 U.S.C. § 1395y(a)(1)(A), states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member."

17. Further, 42 C.F.R. § 410.32(a) provides, "all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

18. Certain laboratories purport to offer testing that uses DNA sequencing to detect mutations in a person's genes that could indicate an increased risk of developing diseases. These include genetic testing to detect mutations that could indicate a higher risk of developing certain types of cancers in the future, an increased risk of developing serious cardiovascular conditions in the future, and a risk of developing other diseases like immunodeficiency diseases, Parkinson's disease, Alzheimer's disease, dementia, diabetes, obesity, pulmonary diseases, and hearing loss (collectively, "genetic testing").

19. In 2015, Novitas issued a Local Coverage Determination ("LCD"), which is a decision by Novitas on whether to cover a particular item or service in its jurisdiction, titled L35062 (Biomarkers Overview) (effective Oct. 1, 2015, revised effective Dec. 12, 2021). LCD L35062 governs the circumstances in which Novitas considers genetic testing medically necessary (and thus properly reimbursable). The LCD requires, among other things, that the result of genetic testing directly impact the treatment being delivered to a beneficiary and considers as statutorily excluded from coverage genetic testing that would be considered screening.

## VII. Probable Cause to Believe that a Crime has been Committed

### A. Relevant Entities and Individuals

20. Redwood Lab Services, LLC ("Redwood") was a Texas corporation with a principal place of business in Harris County, Texas. Redwood was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

21. Elite Clinical Laboratory, Inc ("Elite Clinical") was a Texas corporation with a principal place of business in Harris County, Texas. Elite Clinical was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

5

22. Elite Bio Reference, LLC ("Elite Bio") was a Florida corporation with a principal place of business in Manatee County, Florida. Elite Bio was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

23. Ohio River Laboratories, LLC ("Ohio River") was a Texas corporation with a principal place of business in Harris County, Texas. Ohio River was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

24. Redwood, Elite Clinical, Elite Bio, and Ohio River are collectively referred to herein as "the Labs."

25. Texas Medical Consulting Group, LLC ("TMC") was a Texas company with a principal place of business in Harris County, Texas. TMC purported to provide services to medical practices related to practice consulting, marketing, and partnerships.

26. Defendant SURYAVANSHI occupied a leadership role at the Labs since at least 2021.

27. Chad Harper was a resident of Harris County, Texas, and was an owner of the Labs.

28. Stephen MacLauchlan was at times a resident of Harris and Brazoria Counties, Texas, and was an owner of Labs.

29. John Finlay was a resident of Harris County, Texas, and owned TMC. Finlay used the email address jfmarketinggenius@gmail.com.

**B. *Harper, MacLauchlan, and the Labs***

30. Harper and MacLauchlan were indicted on or about June 24, 2025, by a grand jury sitting in the Southern District of Texas with multiple federal crimes including conspiracy to defraud the United States and pay and receive health care kickbacks, payment of health care

kickbacks in connection with a federal health care program, bank fraud conspiracy, bank fraud, conspiracy to launder monetary instruments, and engaging in transaction in property derived from specified unlawful activity. *United States v. Harper, et al.*, Case No. 4:25-cr-00337 (S.D. Tex. 2025).

31. The Indictment alleges that Harper and MacLauchlan, with other co-conspirators, orchestrated a sophisticated kickback and fraud scheme using the Labs to fraudulently bill Medicare approximately $115 million, much of which was for medically unnecessary genetic tests. The Indictment further alleges that Harper and MacLauchlan, through the Labs and various shell entities, paid kickbacks to numerous marketers, including Finlay, for directing—to the Labs—orders for those genetic tests. The marketers exercised control over providers' decisions to order the genetic tests and to send the genetic tests to the Labs.

### C. SURYAVANSHI's Role in the Labs

32. During investigator interviews with employees of the Labs, SURYAVANSHI was described as the managing partner of the Labs and as the liaison between the Labs and marketers. In that role, SURYAVANSHI played a central role in managing kickback payments to marketers in exchange for the marketers sending orders to the Labs that were used to bill Medicare.

33. For example, correspondence obtained in the investigation shows SURYAVANSHI, in November 2022, communicated with marketers about the volume of DNA samples being collected for genetic testing, including by directing a marketer to push for collection of more samples. Other correspondence from May 2022 shows SURYAVANSHI directed an employee of the Labs to pay marketers based on a percentage of what the Labs received from Medicare based on the orders the marketers directed to the Labs—in other words, payments based on the value of the orders the marketers sent to the Labs.

7

34. Based on correspondence obtained during this investigation, I also have probable cause to believe that SURYAVANSHI understood that paying marketers based on the volume or value of orders was unlawful. For example, in an email SURYAVANSHI sent to MacLauchlan in June 2020, SURYAVANSHI shared a "W2 contract along with other documents that have to be accepted by the new sales reps" at a separate laboratory with which SURYAVANSHI was associated. The referenced contract, which SURYAVANSHI represented to MacLauchlan was "**a fully EKRA Compliant Contract**" (emphasis in email), described paying a marketer as a "W-2 *bona fide* employee" (emphasis in contract), with a salary set forth in advance.[2] Notwithstanding such knowledge, I have probable cause to believe that SURYAVANSHI, while at the Labs, facilitated kickback payments to marketers that were based on the volume or value of orders the marketers sent or directed to the Labs.

### D. Finlay's Role in the Kickbacks

35. Finlay served as the practice manager of "Clinic 1," a medical practice in Houston that provided health care services to patients, including Medicare beneficiaries. "Provider A" is a medical doctor who owned Clinic 1. Provider A pled guilty in an unrelated case and is cooperating with the government in the hopes of receiving leniency in Provider A's sentence. Provider A has not been sentenced. When interviewed by law enforcement, Provider A denied ever authorizing genetic tests at Clinic 1. Despite that, the Labs billed Medicare approximately $900,000 for genetic tests that were purportedly ordered by Provider A.

---

[2] EKRA, or the Eliminating Kickbacks in Recovery Act, makes it a federal crime for anyone, with respect to services covered by a health care benefit program, to knowingly and willfully: solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or pay or offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-to induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory; or in exchange for an individual using the services of that recovery home, clinical treatment facility, or laboratory. A bona fide employee relates to one of the safe harbor provisions of the Anti-Kickback Statute. In my training and experience, this email demonstrates that SURYAVANSHI knew the relevant law and what constituted legal and illegal payments.

36. Finlay, in his role as the owner of TMC, signed a Sales Consultant Agreement with Redwood on September 1, 2020. The Sales Consultant Agreement had a "Compliance" section that included the following language: "Furthermore, there is no type of payment what so ever based on volume or value of referrals."

37. Yet based on analysis of claims data, financial records, internal records from the Labs, and correspondence, I have probable cause to believe that the agreement between the Labs and Finlay was that the Labs paid Finlay approximately 40% of net revenue from orders that Finlay directed to the Labs.

38. All told, Finlay received approximately $1 million in kickbacks based on tests Finlay directed to the Labs. Many of the kickback payments from the Labs to Finlay were made through shell companies, including "Peerless Staffing," which Harper and MacLauchlan set up to pay marketers, among others. In my training and experience, shell companies are often used by individuals engaged in illegal activity to conceal the source or nature of the funds.

*E. The January 2023 Kickback*

39. On or about January 9, 2023, the Labs, through Peerless Staffing, paid Finlay approximately $30,479.

40. One week later, Finlay emailed SURYAVANSHI and another employee of the Labs, questioning Finlay's payment from the Labs for tests Finlay had directed to the Labs. A screenshot of Finlay's email to SURYAVANSHI follows (Finlay refers to SURYAVANSHI as "Tessler Brown," which I know to be SURYAVANSHI's pseudonym):

9

> From: John Finlay <jfmarketinggenius@gmail.com>
> Sent: Monday, January 16, 2023 10:08:23 AM
> To: Tessler Brown <tessler@elitelabs.com>; ▇▇▇@elitelabs.com>
> Subject: JF payment
>
> Hi!
>
> Tessler said my payment this month was $37k, but only $30k was deposited. $91kx40% = NOT $30k
>
> what was the problem?????? LOL, that's a BIG DIFF—please correct at your earliest convenience
>
> john finlay
> ▇▇▇

41. Investigators obtained from the Labs via subpoena a spreadsheet titled "2022 Collections vs. Marketers," which detailed how many orders the Labs collected from marketing groups during each month of 2022. According to the spreadsheet, Finlay directed orders from Clinic 1 to the Labs on which the Labs received approximately $136,438 in December 2022. Of that, according to the spreadsheet, approximately $57,735 came from Medicare. I know from other documents and witness accounts in this investigation that the Labs often calculated a marketer's payment based on profit, rather than gross receipts. Therefore, the "$91k" referenced in the email between Finlay and SURYAVANSHI is consistent with the Labs' profit in December 2022 based on Finlay's orders from Clinic 1, on which SURYAVANSHI calculated Finlay's 40% kickback payment in January 2023.

10

## VIII. Conclusion

42. Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that in and around January 2023, in the Southern District of Texas and elsewhere, SURYAVANSHI, aiding and abetting, and aided and abetted by others, did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to John Finlay to induce John Finlay to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) and 18 U.S.C. § 2.

43. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Cooper Ferreira
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone, and I find probable cause this 22 day of August, 2025.

_____
Honorable PETER BRAY
United States Magistrate Judge

TRUE COPY I CERTIFY
ATTEST: August 22, 2025
NATHAN OCHSNER, Clerk of Court
By: _s/ Peyton Smith_
Deputy Clerk

11