United States Courts
Southern District of Texas
FILED
December 03, 2025
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Criminal No. **4:25-cr-00639** |
| § | |
| SANDESH SURYAVANSHI § | |
| § | |
| a.k.a. TESSLER BROWN § | |
| § | |
| Defendant. § | |

## INFORMATION

The United States Attorney charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" covered, among other things, medical services provided by

physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Medicare "providers" included independent clinical laboratories, physicians, and other health care providers who provided items or services to beneficiaries. To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5. A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application. A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for reasonable and necessary services provided to beneficiaries.

6. A Medicare claim was required to contain certain information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier. The claim form could be submitted in hard

copy or electronically.

7. When receiving and adjudicating claims, Medicare acted through fiscal intermediaries called Medicare Administrative Contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. MACs were responsible for processing Medicare claims arising within their assigned geographic area, including determining whether a claim was for a covered service.

8. When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the services that were purportedly provided, as set forth in the claims, were medically necessary.

9. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of illegal kickbacks and bribes.

**Medicare Coverage for Genetic Testing**

10. Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancer in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

11. Genetic testing for cardiovascular disease ("cardio testing") used DNA sequencing to detect mutations in genes that could indicate an increased risk of developing serious cardiovascular conditions in the future and could assist in the treatment or management of a patient who presently had signs or symptoms of a cardiovascular disease or condition. Genetic testing for cardiovascular disease was not a method of diagnosing whether an individual presently had a

cardiac condition.

12. Laboratories purported to offer genetic testing that used DNA sequencing to detect mutations in genes that could indicate an increased risk of developing diseases including but not limited to cancer, cardiovascular disease, Parkinson's disease, Alzheimer's disease, dementia, and immunodeficiencies (collectively, "genetic testing"). All genetic testing was a form of diagnostic testing.

13. For genetic testing, a beneficiary provided a saliva sample or cheek or nasal swab containing DNA material. The DNA sample was then submitted to a laboratory to conduct genetic testing. Tests were then run on different "panels" of genes. Genetic testing typically involved performing lab procedures that resulted in billing Medicare using certain billing codes, each with its own reimbursement rate.

14. DNA samples were submitted along with requisitions (or the physician's order) that identified the beneficiary, the beneficiary's insurance, and the specific type of genetic testing to be performed. For laboratories to submit claims to Medicare for genetic testing, the requisitions had to be signed by a physician or other authorized medical professional who attested to the medical necessity of the genetic testing.

15. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 C.F.R. § 411.15(a)(1).

16. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional

requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all . . . diagnostic laboratory tests . . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary[.]"

**The Relevant Entities, Defendant, and Relevant Individuals**

17. Redwood Lab Services, LLC ("Redwood") was a Texas company with a principal place of business in Harris County, Texas. Redwood was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing,

18. Elite Clinical Laboratory, Inc ("Elite Clinical") was a Texas corporation with a principal place of business in Harris County, Texas. Elite Clinical was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

19. Elite Bio Reference, LLC ("Elite Bio") was a Florida company with a principal place of business in Manatee County, Florida. Elite Bio was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

20. Redwood, Elite Clinical, and Elite Bio are collectively referred to herein as "the Labs."

21. Covus Holdings LP ("Covus Holdings") was a Texas company with a principal place of business in Harris County, Texas. Covus Holdings received proceeds generated by the Labs.

22. Peerless Staffing Inc ("Peerless Staffing") was a Texas corporation with a principal place of business in Harris County, Texas. Peerless Staffing purportedly operated as a staffing company.

23. Covus Holdings and Peerless Staffing are collectively referred to herein as "the Shell Entities."

24. Texas Medical Consulting Group, LLC ("TMC") was a Texas company with a principal place of business in Harris County, Texas. TMC purported to provide services to medical practices related to practice consulting, marketing, and partnerships.

25. Chad Harper was a resident of Harris County, Texas, and was an owner of the Labs and the Shell Entities. Harper signed the Provider Enrollment Application on behalf of Redwood.

26. Stephen MacLauchlan was at times a resident of Harris and Brazoria Counties, Texas, and was an owner of the Labs and the Shell Entities.

27. John Finlay was a resident of Harris County, Texas. Finlay owned TMC. Finlay was the practice manager at Clinic 1. Physician 1 owned Clinic 1.

28. Defendant **SANDESH SURYAVANSHI** was a resident of Harris County, Texas. **SURYAVANSHI** was an employee of the Labs.

## COUNT ONE
**Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

29. Paragraphs 1 through 28 of this Information are realleged and incorporated by reference as though fully set forth herein.

30. Beginning in or around April 2022, and continuing through in or around August 2025, the exact dates being unknown to the United States Attorney, in the Houston Division of the Southern District of Texas, and elsewhere, the Defendant,

6

**SANDESH SURYAVANSHI**,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, including Harper, MacLauchlan, and Finlay, to:

    a.   defraud the United States by cheating the United States government and any of its agencies and departments out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in their administration and oversight of Medicare;

    b.   violate Title 42, United States Code, Section 1320a-7b(b)(1), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and interstate wire transfer, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and

    c.   violate Title 42, United States Code, Section 1320a-7b(b)(2), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and interstate wire transfer, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering

any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

**Purpose of the Conspiracy**

31.  It was a purpose of the conspiracy for **SURYAVANSHI** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare beneficiaries' DNA samples and arranging for doctors' orders for genetic testing; (b) submitting and causing the submission of false and fraudulent claims to Medicare for genetic testing that was procured through kickbacks and bribes, medically unnecessary, and ineligible for reimbursement; (c) concealing and causing the concealment of kickbacks and bribes; and (d) diverting the kickback and Medicare proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**Manner and Means**

32.  The manner and means by which **SURYAVANSHI** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

33.  Harper, MacLauchlan, and their co-conspirators recruited a network of marketers, including Finlay and other marketers, each of whom had access to, influence with, and control over providers treating Medicare beneficiaries.

34.  Finlay advertised TMC as providing the following services, among others: New Patient Acquisition, Marketing, and Practice Management.  Finlay, through TMC, acted as Clinic 1's practice manager.  As practice manager, Finlay exercised control over the authorization and referral of diagnostic testing, including genetic testing, from Clinic 1.

35.  On or about September 1, 2020, Finlay and Harper executed a Sales Consultant

Agreement that purported to govern the relationship between TMC and Redwood. The Sales Consultant Agreement contained a Compliance section, in which Finlay and Harper purportedly agreed that "there is no type of payment what so ever based on volume or value of referrals."

36. Contrary to the terms of the Sales Consultant Agreement, Harper and MacLauchlan agreed with Finlay to pay TMC illegal kickbacks based on the value of the referrals Finlay sent to the Labs, including referrals from Clinic 1's providers.

37. Induced by Harper and MacLauchlan's offer to pay Finlay kickbacks, Finlay ordered, and caused others to order, genetic testing and other diagnostic testing for Medicare beneficiaries in the name of Clinic 1's providers and others, and directed those orders to the Labs, including in the following ways:

   a. Finlay often authorized genetic testing and other diagnostic testing without the knowledge and permission of Clinic 1's providers.

   b. Finlay used, and directed others to use, fraudulent means to authorize orders for genetic and other diagnostic testing on behalf of Clinic 1's providers. For example, Finlay used, and directed others to use, a stamp purporting to bear Physician 1's signature. Furthermore, Finlay photocopied, and directed others to photocopy, Physician 1's signature on genetic testing and other diagnostic testing order forms.

   c. Finlay ordered, and directed others to order, cardio testing for Medicare beneficiaries in the name of Physician 1, a hand surgeon, when Physician 1 was not treating the beneficiary for any cardiac condition.

   d. Finlay used, and directed others to use, order forms provided by the Labs and bearing the name of one or more of the Labs.

   e. Finlay delivered, often in person, DNA samples and order forms to the Labs.

38. **SURYAVANSHI**, at the direction of Harper and MacLauchlan, through the Labs and the Shell Entities, offered to pay, and paid, kickbacks and bribes to Finlay and other marketers, to induce the referral of DNA samples of Medicare beneficiaries and to induce the ordering and arranging for and recommending the ordering of genetic testing for Medicare beneficiaries, knowing that the Labs would bill Medicare for genetic testing that was purportedly provided for these beneficiaries and that was predicated on kickbacks and bribes.

39. Finlay, marketers, and others solicited and received kickbacks and bribes from **SURYAVANSHI**, Harper, MacLauchlan, and other co-conspirators in exchange for DNA samples and doctors' orders for genetic testing, knowing that the Labs would bill Medicare for genetic testing based on the DNA samples and doctors' orders referred to the Labs.

40. Marketers influenced, directed, and controlled providers regarding whether to order genetic testing and to refer genetic testing orders and DNA swabs to the Labs.

41. **SURYAVANSHI**, at the direction of Harper and MacLauchlan, and their co-conspirators hired "collectors" to work inside the offices of providers who referred DNA samples and orders for genetic testing to the Labs. "Collectors" were required to prepare order forms, collect DNA samples, and send all orders and samples to one of the Labs. Collectors often took instruction from one or more marketers.

42. Harper and MacLauchlan attempted to disguise and conceal the source and unlawful nature of kickbacks and bribes to marketers and others, including by using accounts in the name of Peerless; by describing the payments as having a "set rate" and "not based upon the volume or value of any patient referrals;" by fraudulently describing conspiratorial agreements as "independent contractor agreements" and "marketing agreements;" by concealing the payments as "partnership distributions;" and by concealing from the Labs' employees how payments were

10

calculated.

43.     **SURYAVANSHI**, at the direction of Harper and MacLauchlan, and their co-conspirators caused the Labs to submit false and fraudulent claims to Medicare for genetic testing knowing that they were procured through the payment of kickbacks and bribes, medically unnecessary, unrelated to the purported provider's practice area (for example, a podiatrist referring tests for breast cancer), and ineligible for reimbursement for one or more of the following reasons: the services were not authorized by a licensed provider (such as by forgery or unauthorized copying), the services were not reasonable and necessary, the beneficiaries did not qualify for services, and the services were not provided as billed (including by unbundling, stacking, and fraudulent use of modifiers).

44.     From in or around May 2022, and continuing through in or around August 2025, **SURYAVANSHI**, at the direction of Harper and MacLauchlan, and their co-conspirators, submitted and caused the Labs to submit approximately $4.7 million in false and fraudulent claims to Medicare for genetic testing that was: (a) induced through kickbacks and bribes; (b) medically unnecessary; and (c) ineligible for reimbursement.  Medicare paid approximately $3.4 million based on those false and fraudulent on those claims.

45.     **SURYAVANSHI** and his co-conspirators used the funds they received from Medicare to benefit themselves and others, and to further the scheme.

## Overt Acts

46.     In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Houston Division of the Southern District of Texas, and elsewhere, at least one of the following overt acts, among others:

   a.     On or about May 4, 2022, **SURYAVANSHI** sent an email to an employee of the

        Labs directing the employee to pay several of the marketers illegal kickbacks. Many of **SURYAVANSHI's** calculations were based on the value of the reimbursement from Medicare that the Labs received.

b.     On or about January 9, 2023, Harper and MacLauchlan, through Peerless, paid Finaly approximately $30,479.

c.     On or about January 16, 2023, Finlay sent an email with the following to **SURYAVANSHI** and another lab employee about Finlay's monthly kickback payment: "[**SURYAVANSHI**] said my payment this month was $37k, but only $30k was deposited. $91 kx40% = NOT 30k[.]"

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461(c))

47.     The allegations contained in Counts One of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7); and Title 28, United States Code, Section 2461(c).

48.     Upon conviction of the offense set forth in Count One of this Information, the Defendant, **SANDESH SURYAVANSHI**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

49.     Defendant **SANDESH SURYAVANSHI** is notified that upon conviction, a money judgment may be imposed against him. If any of the property described above, as a result of any act or omission of the Defendant:

      a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with, a third party;

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the amount of the money judgment pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

UNITED STATES OF AMERICA, by

NICHOLAS J. GANJEI
UNITED STATES ATTORNEY

LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION

 /s/ Adam Tisdall
ADAM TISDALL
DEVON HELFMEYER
ANDREW TAMAYO
TRIAL ATTORNEYS
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE